## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CRAIG S. BROOKS,                 *

Plaintiff                    *

v.                           *         Civil Action No. PWG-17-3063

WARDEN FRANK B. BISHOP, JR., *et al.*,   *

Defendants               *
                           ***

## MEMORANDUM OPINION

Plaintiff Craig S. Brooks filed this civil rights action, alleging that Defendants[1] violated his rights under the Free Exercise Clause of the First Amendment to the U.S. Constitution and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.* ECF No. 1. Defendants have filed a Motion to Dismiss or, in the Alternative, for Summary Judgment, along with a Memorandum in Support, ECF Nos. 17, 17-2, and Brooks has filed an Opposition, ECF No. 33. Brooks also filed several documents that were docketed as "Supplements" to the Complaint; each includes declarations and/or other evidence in support of his claims. ECF Nos. 24, 25, 26, 27, 35, 39. And, he filed a "Rule 56(d) Motion" and "Declaration/Affidavit," which also was docketed as a "Supplement." Pl.'s Rule 56(d) Mot. & Decl., ECF No. 31. The Rule 56(d) Motion includes additional argument in opposition to Defendants' dispositive motion. Defendants filed an Opposition to Plaintiff's Rule 56(d) Motion. Defs.' Opp'n to Rule 56(d) Mot. & Decl., ECF No. 32.

Defendants have filed a Motion to Strike one of Plaintiff's Supplements (ECF No. 35),

---

[1] Defendants are Warden Frank Bishop, Jr., Assistant Warden Jeff Nines, Chief of Security William Bohrer, Officers Kevin Lamp, Hughes, and Bowers, Sergeant Thrasher, B. Bradley, Commissioner of Corrections, Executive Director Russell Neverdon, Deputy Director Robin Woolford, Deputy Director Michael Zeigler, and Secretary Stephen Moyer.

ECF No. 36, and Brooks filed an Opposition, ECF No. 38. Additionally, Brooks filed Motions for Preliminary Injunction regarding his housing at WCI. ECF Nos. 41 and 43. Defendants have responded, ECF No. 44, and Brooks has replied, ECF No. 46.

The matters are now ripe for review. The Court finds a hearing in these matters unnecessary. *See* Loc. R. 105.6 (D. Md. 2018). For the reasons that follow, Plaintiff's Rule 56(d) Motion is DENIED, Defendants' Motion to Strike is DENIED as moot, Defendants' dispositive motion, construed as a Motion for Summary Judgment, is GRANTED, and Plaintiff's Motions for Injunctive Relief are DENIED.

## BACKGROUND[2]

Brooks, a state inmate currently confined at the Western Correctional Institution ("WCI") in Cumberland, Maryland alleges that in July of 2015, while he was incarcerated at the North Branch Correctional Institution ("NBCI") in Cumberland, Maryland, his rights under the First Amendment and RLUIPA were violated when Warden Bishop cancelled daily Nation of Islam ("NOI") congregate services during Ramadan. Compl. He also alleges that his rights were violated when NOI members were not allowed to use the bathroom to cleanse during congregate worship services and not provided NOI bag meals with which to break their Ramadan fasting,[3] and

---

[2] To decide Defendants' motion for summary judgment, I consider the facts in the light most favorable to Brooks as the non-moving party, drawing all justifiable inferences in his favor. *Ricci v. DeStefano,* 557 U.S. 557, 585–86 (2009). The background includes the undisputed facts, as well as Brooks's unsupported allegations that Defendants do not dispute.

[3] If Brooks's intent is to raise claims against Defendants on behalf of other inmates, he may not do so. *See, e.g.*, *Hummer v. Dalton,* 657 F.2d 621, 625–626 (4th Cir. 1981) (a *pro se* litigant's "suit is ... confined to redress for violation of his own personal right" and he cannot act as a "knight-errant" for others); *Oxendine v. Williams,* 509 F.2d 1405, 1407 (4th Cir. 1975) ("[I]t is plain error to permit [an] imprisoned litigant who is unassisted by counsel to represent his fellow inmates in a class action."); *Inmates v. Owens,* 561 F.2d 560, 562–63 (4th Cir. 1977) (a *pro se* inmate does not have standing to sue on behalf of another inmate). Accordingly, these claims will be construed as claims that Defendants violated *his* rights by not allowing *him* to use the bathroom to cleanse

when officers questioned him about services.  *Id.*  Brooks seeks compensatory and punitive damages as well as an order requiring his transfer from the Cumberland region due to his fears that staff will retaliate against him and abuse him.  *Id.* at 15.

### A.  Factual Background

NBCI is "a supermax facility, with minimal space for group activities." Warden Bishop Decl. ¶ 2, ECF No. 17-6.  The facility is divided into a North and South compound, each of which has two housing units (segregation unit and high security unit on the North compound and two less restrictive units on the South compound) and a gym with two small rooms adjoining it. *Id.* ¶¶ 2, 4; Harbaugh Decl. ¶ 4, ECF No. 17-4.

"In 2013 and 2014, NBCI was on lock down as the result of gang warfare and multiple assaults to include stabbings of both Inmates and staff members."  Harbaugh Decl. ¶ 4; Warden Bishop Decl. "After the 18-month lock-down . . . positive results" were observed, Warden Bishop Decl. ¶ 4, including that the Security Threat Groups ("STG") and NOI "had been somewhat stabilized," Harbaugh Decl. ¶ 7.  Small group religious study and services were reintroduced, including separate weekly congregate services for Muslim inmates housed on the North compound in Housing Unit 2, and separate weekly congregate services on the South compound for those housed in Housing Units 3 and 4.  Harbaugh Decl. ¶ 4; Warden Bishop Decl. ¶ 4.

Brooks is a member of the Nation of Islam ("NOI").  Captain Jason Harbaugh, the Intelligence Supervisor at NBCI in 2015, and Kevin Lamp, the Chaplain at NBCI since 2007, described NOI as a "gang like affinity group that promotes racial and sexist hatred," Harbaugh Decl. ¶ 5, "including through its publication 'The Final Call,'" Chaplain Lamp Decl. ¶ 14, ECF

---

during congregate worship services and not providing *him* with NOI bag meals with which to break his fast.

No. 17-5. According to Harbaugh, members of NOI "are likely to retaliate" when one of their members "is threatened or disrespected." Harbaugh Decl. ¶ 5. He states that NOI members actively recruit new members and "discourage[e] attrition" among their ranks. *Id*. Harbaugh asserts that "members of other STGs have been known to drop their affiliation and join NOI." *Id*.

NOI has several requirements, and a failure to meet them would constitute "a violation of religious edict." Chaplain Lamp Decl. ¶ 6. "Attending congregate Ramadan services" is not a NOI requirement; rather, attendance at congregate services "is a matter of an individual's preference." *Id*. Similarly, while NOI requires the Ramadan fast, it recommends but does not mandate any other specific practices for eating. *Id*. ¶¶ 6, 11; "Final Call" Foods to Avoid 1, January 16, 2014, ECF No. 17-7. NOI members with available funds, who are not housed in Housing Unit 1, may purchase items to eat outside of fasting times from the commissary. Warden Bishop Decl. ¶ 10.

In summer 2015, NBCI permitted daily NOI congregate services for Ramadan that were open to inmates housed in all of the housing units across the compound. Harbaugh Decl. ¶ 6; Warden Bishop Decl. ¶ 4. At that time, all multipurpose rooms on both the North and South compound were in use by various religious groups for services. Chaplain Lamp Decl. ¶ 7. Conflicts between the various Muslim denominations required each group to be assigned a space that was "securely separated from the others." Warden Bishop Decl. ¶ 6. The restrooms open to the main gym and are separated only by a half-door. Chaplain Lamp Decl. ¶ 8. Given the number of inmates involved in the various Muslim services taking place during the same time, the security of the area, and the need to minimize disturbances with ongoing religious services, a policy was established prohibiting inmates from using the restroom during services. Chaplain Lamp Decl. ¶ 8. Defendants state that, before the daily Ramadan services began, "inmate Muslim leaders were

advised that service attendees would not be able to use the restrooms during service time and could cleanse in their cells." Chaplain Lamp Decl. ¶ 9; Warden Bishop Decl. ¶ 6. Brooks states that, after he challenged this rule and the Commissioner overturned the Warden's Administrative Remedy Procedure ("ARP") denial, NOI were allowed to use the bathroom during Saturday morning services. Pl.'s Rule 56(d) Mot. & Decl. 20.

With the introduction of combined services, "NOI membership doubled." Harbaugh Decl. ¶ 6; Chaplain Lamp Decl. ¶ 4; Warden Bishop Decl. ¶ 4; July 1, 2015 Harbaugh Mem. to Warden Bishop, ECF No. 17-10, at 88. The number of verified STG members within NOI "increased substantially," and a high number of verified STG members attended the daily congregate Ramadan services. Harbaugh Decl. ¶ 6; Chaplain Lamp Decl. ¶ 4; Warden Bishop Decl. ¶ 4. According to Harbaugh, attendance at the NOI daily Ramadan congregate service by "the larger mixed-security-level group" provided "an opportunity for inmates to form new alliances, recruit new members, and compete for position within gang hierarchies and between gangs." Harbaugh Decl. ¶ 7; *see also* July 1, 2015 Harbaugh Mem. to Warden Bishop.

On July 1, 2015, inmate Derrick Williams,[4] a member of NOI who regularly attended NOI Ramadan services, stabbed inmate Dante Jeter on the North compound. Harbaugh Decl. ¶ 8;

---

[4] Brooks has provided a photograph of members of the Fruit of Islam/Nation of Islam at NBCI, which he claims does not include Williams or Jeter. Photograph, ECF No. 24-2; Pl.'s Rule 56(d) Mot. & Decl. 20. In his view, this proves that Williams was not a member of the group and the stabbing was therefore unrelated to the NOI services. Williams, however, had designated the Nation of Islam, Ferrakhan as his religious affiliation. Williams's Religious Preference Registration Form 2, ECF No. 32-2. Therefore, he was considered NOI and eligible to participate in NOI services. Chaplain Lamp Decl. ¶ 2. Additionally, Chaplain Lamp states that Williams regularly attended NOI Ramadan services in 2015. *Id.* ¶ 15. Brooks asserts that he "does not know these men as FOI/NOI members," but he is aware they are members of BGF and suggests they are most likely some of the known STG members who joined NOI prior to Ramadan. Pl.'s Rule 56(d) Mot. & Decl. 20.

Chaplain Lamp Decl. ¶ 15; Department of Public Safety and Correctional Services ("DPSCS") IID Report of Assault, ECF No. 17-9; Williams's Religious Preference Registration Form 2, ECF No. 32-2. It is undisputed that the stabbing did not occur at an NOI Ramadan service. Williams and Jeter were both "verified members of an STG, the Black Guerilla Family ('BGF')."[5] Harbaugh Decl. ¶ 8. Within hours of the stabbing, Warden Bishop ordered Housing Unit 2, where Williams and Jeter were housed, locked down and directed that inmates "be bag-fed for dinner that day and breakfast the next day pending further investigation." Warden Bishop Decl. ¶ 8.

"Shortly after the July 1, 2015 stabbing, the NBCI Intelligence Department[] received a credible communication from a confidential informant that the attack . . . was planned during NOI daily Ramadan services." Harbaugh Decl. ¶ 9. According to Harbaugh, the informant appeared to have attempted, without success, to alert staff to the planned attack prior to the stabbing. *Id.* "The NBCI Intelligence Department also received multiple credible reports that gang members and possibly others were routinely conducting illicit activities during NOI daily Ramadan services." *Id.* ¶ 10. Based on this information, on July 1, 2015, Harbaugh prepared a memorandum to Warden Bishop regarding the concerns about NOI daily Ramadan services. *Id.* ¶ 11; Warden Bishop Decl. ¶ 9. Harbaugh and Bishop met to discuss these concerns. Harbaugh Decl. ¶ 12; Warden Bishop Decl. ¶ 9.

The day after the stabbing, after NOI Ramadan services concluded for the night, Officers Hughes, Bowers and Thrasher instructed Brooks to stand against the wall, where he was "grilled in a semi-circle by (5) officers on what [he] was teaching from the Final Call Newspaper, Holy

---

[5] Williams ultimately pled guilty to the inmate rule violation that issued after the stabbing. Department of Public Safety and Correctional Services ("DPSCS") IID Report of Assault 59. He was also charged with assault and related offenses in the District Court of Maryland for Allegany County. *Id.* at 79 (Case No. 6W00071973).

Bible and Holy Qur'an …."  Compl. 4.  Brooks notes that the officers questioned him about the service even though they had been present for the entire service.  *Id*.  The following day, Warden Bishop cancelled the daily congregate Ramadan services for NOI, Warden Bishop Decl. ¶ 10, and Brooks was advised, without explanation, that he would not be permitted to lead services for the remaining days of Ramadan, Compl. 4.  Also, NOI members in the North and South compounds were separated for weekly services.  Harbaugh Decl. ¶ 18. The separation interrupted channels of communication as well as areas of conflict and reinstituted the pre-Ramadan "division, which had been relatively stable."  Harbaugh Decl. ¶ 18.

Harbaugh declares that "[i]t would not have been possible by the end of Ramadan 2015 to conclude an investigation that would have identified and allowed removal of dangerous NOI participants from the NOI congregation."  Harbaugh Decl. ¶ 14.  Brooks insists that Secretary of DPSCS Stephen Moyer, as the supervisor of all of the other named Defendants, and in his capacity as Secretary, would have been able to review the video of the stabbing that occurred during Ramadan and video of services to determine whether STG groups were congregating in the area of the services area to organize illicit activities.  Compl. 10.  And, asserting that "[t]he members of the NOI . . . wear white or blue shirts and bowties," Brooks contends that "[i]t is the duty of the Chief of Security and Chaplin [sic] to know the sincere believers of the faith and to ensure that security and safety protocols are in place and religious accommodations extend[] only to sincere believers."  *Id.* at 11; *see* Pl.'s Rule 56(d) Mot. & Decl. 22.

According to Harbaugh, security cannot determine, simply based on the clothing an inmate wears, whether he plans to participate in an illicit activity or is a risk to the security of the institution.  Harbaugh Decl. ¶ 15.  Similarly, "a verified STG member may hold sincere religious beliefs and may have presented no security threat in attending NOI daily congregate services."  *Id.*

¶ 16.  Not knowing the extent of, or who participated in the illicit activity, the continuation of "daily meetings of any NOI groups presented an unreasonable risk of dangerous activities." *Id.* ¶ 18.  According to Harbaugh, the continuation of daily services after the stabbing and information provided to the Intelligence Department "would have increased tension and allowed more opportunity for retaliation and other violence." *Id.* ¶ 17.

After the NOI daily congregate Ramadan services were cancelled, NOI inmates were not transported to post-sundown meal services, due to a "misunderstanding." Warden Bishop Decl. ¶ 11.  As a result, "they did not receive post-sundown meals" or the bagged "food that would have served as their breakfast" the next day. *Id.*

Throughout 2015, Brooks regularly ordered food items through the prison commissary. Commissary Items, ECF No. 17-8, at 2-26. Indeed, during the approximate two weeks that Brooks did not receive a meal bag to break his Ramadan fast, he ordered and received food from the prison's commissary. *Id.* at 18-20.  Brooks states that he used the commissary items (which were outside his diet) to pay a typist to type legal briefs for him. Pl.'s Rule 56(d) Mot. & Decl. 19.  He works in the kitchen and purchases food from kitchen workers when necessary. *Id.* at 20.

### B.  Administrative Remedy/Grievance History

On July 6, 2015, Brooks submitted Administrative Remedy Procedure ("ARP") NBCI-1345-15, complaining that daily congregate prayers no longer were allowed, officers had harassed him about services, NOI were not allowed to use the bathrooms during services, and NOI were not given their bagged meals to break the fast. ARP, ECF No. 17-8, at 27–28, 30; Compl. 4.  Acting Warden Nines dismissed the ARP, reasoning that pursuant to "DMC-140, the Warden may discontinue a religious activity at any time for security purposes." *Id.* at 27.  Nines noted that "[t]he NOI services became a threat to the security and orderly operation of the institution," which

justified their cancellation. *Id.* The dismissal did not address Brooks's other concerns regarding harassment, bag meals, or use of the bathroom. *See id.*

Brooks appealed the dismissal of his ARP to the Commissioner of Corrections. ARP, ECF No. 17-8, at 32. The Commissioner found the appeal was "meritorious in part in that the Warden did not fully address [Brooks's] initial complaint." *Id.* at 31. The Commissioner agreed that "the Warden ha[d] the authority to modify or cancel a religious service or event based on security concerns," but the Warden had failed to address Brooks's concerns regarding his ability "to properly break [his] daily Ramadan fast" or the issue regarding restroom accommodations. *Id.* The Commissioner recommended "further investigation by the facility," directed the Warden "to fully address complaints in their entirety," and advised Brooks that "[n]o further action [wa]s warranted through the ARP process." *Id.* Brooks claims that Warden Bishop never responded to the other allegations in the ARP. Compl. 7. However, Brooks also states that, after the Commissioner overturned the Warden's ARP denial, NOI were allowed to use the bathroom during Saturday morning services. Pl.'s Rule 56(d) Mot. & Decl. 20.

Brooks filed a grievance with the Inmate Grievance Office ("IGO"), Grievance, ECF No. 17-10, at 10-13, which rejected Brooks's claims regarding the cancellation of services and the "deni[al] [of his] opportunity to participate in the religious fast." Jan. 15, 2016 IGO Dismissal, ECF No. 17-10, at 25.

Brooks then filed a Petition for Judicial Review in the Circuit Court for Allegany County. Pet., ECF No. 17-10, at 1. On February 1, 2017, the state court reversed the decision of the IGO in part and remanded the case to the IGO for further administrative proceedings, finding that, while "[t]here [wa]s ample evidence to support the response to the complaint of cancellation of services pursuant to DCM-140," the Warden had never addressed Brooks's complaints regarding the

bathroom facilities and breaking the fast.  Mem. & Order, ECF No. 17-10, at 69-70.  Thereafter, counsel for the IGO advised Brooks and the state court that the IGO "sent the matter back to the Warden to address the issues raised in th[e] Court's Memorandum and Order."  May 3, 2017 Ltr., ECF No. 17-10, at 71.  On June 7, 2017, Brooks filed a Motion for Constructive Civil Contempt, contending that the IGO failed to hold a hearing to resolve his claims.  Pl.'s Mot. for Contempt, ECF No. 17-10, at 76–79.  The court denied the motion.  *Id.* at 95.  Brooks acknowledges that Warden Bishop responded on October 7, 2015, but in his view, it was "a hollow response . . . that further violated Plaintiff's 1st and 14th Amendment Rights and the RLUIPA."  Compl. 12. Nevertheless, Brooks did not appeal the Warden's response.

## NON-DISPOSITIVE MOTIONS

### A.  Motion to Strike

ECF No. 35 includes (1) a declaration that identifies the attachments, ECF No. 35, (2) a cover letter, ECF No. 35-1, and (3) a June 3, 2018 ARP and Appeal, (4) a Notice of Assignment to Administrative Segregation, and (5) a Waiver and Notification of Case Management Action, ECF No. 35-2.  It appears that Brooks filed these documents to challenge his May 27, 2018 assignment to administrative segregation, in essence, supplementing his complaint with a new claim.  Defendants move to strike these documents, arguing that "Mr. Brooks has neither expressly requested that new claims be added to this case nor alleged any just terms," as required by Rule 15(d), and in any event the supplement would be futile because Brooks has not stated a claim in ECF No. 35 against any Defendant with regard to being placed in administrative segregation or alleged that he exhausted his administrative remedies.  Defs.' Mot to Strike 2.

"The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Defendants do not contend that ECF No.

35 is any of these. And, although the court maintains wide discretion in considering a motion to strike, *see Haley Paint Co. v. E.I. Du Pont De Nemours & Co.,* 279 F.R.D. 331, 336 (D. Md. 2012), "Rule 12(f) motions are generally viewed with disfavor 'because striking a portion of a pleading is a drastic remedy and because it is often sought by the movant simply as a dilatory tactic.'" *Waste Mgmt. Holdings, Inc. v. Gilmore,* 252 F.3d 316, 347 (4th Cir.2001) (quoting 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1380, 647 (2d ed. 1990)).

Nonetheless, a party is not at liberty to supplement his pleadings whenever it suits him. Supplemental filings must be requested by motion, providing any adverse party with reasonable notice and an opportunity to oppose the supplementation; the court must rule on the motion, granting it if finds "just terms" to do so, and that the supplement "set[s] out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented.". Fed. R. Civ. P. 15(d). Procedurally, as a Supplement to the Complaint, ECF No. 35 is deficient, as Brooks did not file a motion to supplement. *See id.* And, while his assignment to administrative segregation happened after Brooks filed his Complaint, *see id.*, he has not stated his basis for challenging the assignment or provided any justification for adding the additional information to his Complaint.

Certainly, in his Opposition, Brooks complains that, while he was housed at WCI, a "small legal pad" of his was confiscated after "someone used [his] name, ID#, and old cell address to threaten one of the officer[]s on a request slip"; the pad was returned to him two days later, after the officers determined that he "did not write the note." Pl.'s Opp'n 4–5. Then, he was placed in administrative segregation at WCI "39 days after being cleared," which he views as "harassment because of Plaintiff's civil lawsuit." *Id.* at 5. And, he discusses his housing assignment at length in his preliminary injunction motions. But, neither a preliminary injunction motion nor an

opposition to a dispositive motion is a vehicle for amending a complaint. *See Whitten v. Apria Healthcare Grp., Inc.*, No. PWG-14-3193, 2015 WL 2227928, at *7 (D. Md. May 11, 2015). Moreover, given that Brooks's initial Complaint concerns denial of religious services in 2015 at NBCI, Brooks's allegations against unnamed correctional staff at a different facility, regarding harassment and improper assignment to administrative segregation in 2018 are too far removed from the initial claim. Thus, insofar as ECF No. 35 (or even the preliminary injunction motions) could be construed as a Rule 15(d) motion to supplement, *see* Fed. R. Civ. P. 1, it is denied. Brooks may file a new civil rights complaint detailing these allegations and naming the proper Defendants if he believes his constitutional rights have been violated. Having construed ECF No. 35 as a motion to supplement, and denied it, the Motion to Strike, ECF No. 36, is denied as moot.

**B. Request for Discovery**

Brooks seeks discovery of the following information: 1. videos of (a) the dining room showing "the officers in the NOI service and outside surrounding the Brooks after all participants were dismissed"; (b) "Plaintiff leaving Housing Unit 4 on August 12, 2015, in route to the North Side of the prison to meet with Officer, Chaplin [sic] Kevin Lamp"; (c) "the stabbing incident"; (d) the "STG group activity taking place in the rear of the NOI Ramadan service to do illegal activity"; and (e) the incident at WCI when his legal pad was confiscated;[6] and 2. a request in his handwriting to go to the North compound of the prison to teach class. Pl.'s Rule 56(d) Mot. & Decl. 1, 18–19, 35; *see also id.* at 24–25. Brooks contends that the videos are exculpatory and would show what "truly transpired to warrant the cancelation [sic] of Ramadan for the NOI in 2015." *Id.* at 25. He states that he has sought this evidence since "the initial ARP sent to the

[6] As discussed, this incident is not before this Court, and therefore I will not consider this request for discovery.

Warden." *Id.* at 27.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2011). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To that end, Federal Rule of Civil Procedure 56(d) unambiguously provides that:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> (1) defer considering the motion or deny it;
>
> (2) allow time to obtain affidavits or declarations or to take discovery; or
>
> (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d). Brooks labeled his Rule 56(d) Motion as a "Declaration/Affidavit," in addition to labeling it "Rule 56(d) Motion," and it includes a notary's stamp that states that the Declaration/Affidavit was "[s]ubscribed and sworn to" before the notary. *See* Pl.'s Rule 56(d) Mot. & Decl. 35. But, Brooks has not shown how the requested material would justify his opposition, and therefore the requests will be denied. *See* Fed. R. Civ. P. 56(d).

As best I can discern, Brooks believes that the videos of the Ramadan services would show that nothing illicit happened during services and that the officers in fact sat in on a service and discussed the service with him afterward. As discussed more fully below, any claim that officers improperly sat in on Ramadan services or harassed him after services is not properly before the Court, as the claim has not been exhausted. Further, even if the claim were preserved, Brooks has failed to allege that he was harmed in any way by the conduct of the officers. Moreover, it is

unclear how the videos—regardless what they actually showed—could negate Defendants' contentions that they *received credible information* that illicit activity took place during the services, even if no such activity in fact occurred. Accordingly, the videos will not support Brooks's case.

Similarly, Brooks fails to justify his requests for documents and video evidence of his visit to the North compound and his meeting with Chaplain Lamp—two events he insists did not occur. He appears to make this request to contradict Defendants' assertions that these events occurred. But, Brooks's statements in his notarized Rule 56(d) motion/affidavit that he did not seek permission to go to the North compound, did not go to the North compound, and did not meet with Chaplain Lamp regarding cancellation of Ramadan services constitutes sufficient evidence at this juncture to contradict Defendants' version of events without any additional corroborating documents or video. In resolving a motion for summary judgment, the Court does not make credibility determinations, but merely assesses whether the pleadings and other properly considered information in the record creates a genuine dispute of material fact. *Anderson v. Liberty Lobby*, Inc. 477 U.S. 242, 249 (1986). Therefore, the documents and video that Brooks seeks to discover are merely cumulative to his own sworn statement, which is sufficient to contradict the Defendants' version of the events regarding his purported visit to the North compound and meeting with the Chaplain. Therefore, it is not necessary to delay ruling on the motion in order for him to be able to obtain this discovery because it is not necessary for him to oppose the Defendants' motion.

The last evidence Brooks seeks is the video of Jeter's stabbing. Brooks contends that Defendants have at various times in other contexts stated that the stabbing occurred during the Ramadan service rather than outside on the compound. Presumably Brooks seeks this video to

show that the stabbing did not occur at the Ramadan service. But the Defendants do not make such a contention here; they agree that the stabbing occurred outside of Ramadan services. Therefore, the video of the stabbing would not assist Brooks in opposing Defendants' dispositive motion. Accordingly, Plaintiff's Rule 56(d) Motion, ECF No. 36, is denied, although I will consider Brooks's statements in the motion.

### C. Motions for Injunctive Relief

Brooks has filed two Motions for Injunctive Relief, first on January 7, 2019, asking the Court to enjoin Defendants from continuing to house him in administrative segregation or to transfer him from WCI to another facility, and then on January 11, 2019, complaining that he was told that he would be returned to the general population, where he fears he would be in danger, and asking again to be transferred to another facility. Pl.'s Jan. 7, 2019 Inj. Mot. 1, 7, ECF No. 41 (filed 1/14/19); Pl.'s Jan. 11, 2019 Inj. Mot., ECF No. 43 (filed 1/18/19).

In his first motion, Brooks states that he was offered money to settle this case and threatened that if he failed to do so he would remain on administrative segregation; he refused to settle. Pl.'s Jan. 7, 2019 Inj. Mot. 2, 7. He alleges that he previously was removed from administrative segregation and returned to the general population at WCI, where he was attacked by another inmate, Michael Feehley. *Id.* at 2–3. He claims that he "was stabbed [and] given a disciplinary infraction for having a dull razor," even though he "did not use [it] to defend himself." *Id.* at 3.

Brooks insists that inmate Jabraiyl Hale, against whom Brooks testified in criminal proceedings, "sent Michael Feehley to stab Plaintiff." *Id.* at 6. Brooks states that he "was under duress . . . at WCI by Jabraiyl Hale's friends," whom he does not name. *Id.* He states that he knows that he "cannot pick and choose who he's being housed with," but that the administration has

housed him with mentally ill inmates and members of STGs intentionally, "to frustrate and unnerve Plaintiff." *Id.* at 4. Notably, Brooks asserts that he has been able to work things out with his cellmates. *Id.* at 3. He states that he "fears for his safety and life . . . at WCI." *Id.* at 4. He claims that he "has been awaiting transfer since September 13, 2018,"[7] and that his cellmates have been transferred out of the facility while he has not. *Id.* at 4–5.

In his second motion, he states that he has learned that he will be returned to the general population, and he asserts that he will have to refuse the housing assignment and be placed on disciplinary segregation for refusing, because he fears for his safety in the general population. Pl.'s Jan. 11, 2019 Inj. Mot. 2–3. He wishes to be transferred instead. *Id.*

> According to Defendants,
>
> [a]s of January 31, 2019 [after Plaintiff filed both of his motions for injunctive relief], Mr. Brooks has been housed in Administrative Segregation to address and investigate his claims that he has enemies unknown and unidentified. *See* Declaration of Warden Graham ("Graham Dec."), Ex. 1; Declaration of Cory Walker ("Walker Dec."), Ex. 2 ¶ 6. He will only have contact with his cell partner to include recreation and showers. Ex. 2 ¶ 7. Plaintiff will be escorted by Correctional Staff during any out of cell movement. *Id.* Thus, Mr. Brooks's concerns about his safety have been addressed.

Defs.' Resp. 1.

---

[7] Brooks also alleges that he "is having problems with his mail not reaching its destination," and in December, he "did not receive a Case Management Action Form that would state if administrative segregation would continue or Plaintiff would be transferred." Pl.'s Jan. 7, 2019 Inj. Mot 5; *see also* ECF No. 48 (alleging that his mail is not sent out). Brooks asks that WCI be ordered to produce "every Case Management Action Form from May 27, 2018, and justify why Plaintiff was placed on administrative segregation in the first place." Pl.'s Jan. 7, 2019 Inj. Mot 5. He also seeks reimbursement from June 2018 to the present for pay he would have received had he not been removed from his job without justification. *Id.* These issues are unrelated to the matters alleged in Brooks's initial Complaint, as well as the issues concerning his safety to which Defendants were directed to respond. Therefore, they will not be addressed here. In this case alone, the Court has received 25 separate filings from Brooks. Brooks is free to file a new civil rights complaint naming specific defendants if he believes his rights were violated based on the conduct alleged.

An inmate may be placed on administrative segregation if "[r]easons exist to believe that [the inmate is] dangerous to the security of the institution and/or inmates and/or staff" or "[a]n investigation is pending in [the inmate's] case," among other reasons. Notice of Assignment, ECF No. 44-4, at 21. Brooks was placed on administrative segregation on April 13, 2018 for these two reasons, *id.*, and again on May 27, 2018 because an investigation was pending in his case, *id.* at 11. On August 13, 2018, he was placed on administrative segregation again; the Administrative Segregation Investigative Report stated that the "Reason for Investigation" was a "Documented enemy at WCI" and that Brooks and Feehley had been "observed striking each other with weapons," after which Brooks pled guilty to inmate rule violation "#105" (posses, use, or manufacture a weapon); the assault or battery charge against him was dismissed. *Id.* at 22, 47–49, 56. He was sanctioned with 30 days of disciplinary segregation, with the recommendation that he be "[a]ssign[ed] to A/S [administrative segregation] pending review for appropriate housing and potential transfer." *Id.* While Brooks insists that he was attacked and never struck back, he admits that he had a weapon. Pl.'s Reply 3, 4 ("Plaintiff had the razor taped to his right thumb on a wire and never swung it at Michael Feeley.").[8]

After the fight, Brooks told staff that the fight occurred because Hale sent Feehley to attack him. Jan. 3, 2019 Mem. to Admin. Seg. Team, ECF No. 44-4, at 26. Staff investigated these claims (while Brooks remained on administrative segregation pending the outcome of the investigation) and, in January 2019, concluded Brooks could be safely housed in general population at WCI

---

[8] In his Reply, Brooks takes issue with facts contained in the serious incident reports and notice of inmate rule violation notices generated as a result of the fight with Feehley. Pl.'s Reply 3–4. None of his concerns are relevant to the resolution of the Motions for Injunctive Relief. Additionally, if Brooks believes that Officer Skelley failed to protect him from a known risk of harm, or his rights were otherwise violated by the conduct of correctional staff relative to the fight, his subsequent placement on segregation status, and/or the handling of his administrative complaints, he may file a new civil rights complaint setting forth those allegations. They shall not be considered here.

because his two documented enemies (Hale and Feehley) had been transferred. *Id.* Nevertheless, as of January 31, 2019, Brooks has been housed on Administrative Segregation in order to investigate his claims that he continues to have enemies at WCI. Graham Decl. ¶ 5, ECF No. 44-1; Walker Decl.¶ 6.

While an inmate can be placed on administrative segregation while safety concerns are investigated, *see* Notice of Assignment, ECF No. 44-4, at 21, placement in protective custody "is appropriate only when required for the protection of the inmate," and "[e]very effort shall be made by Case Management staff and the managing official to find suitable alternatives to protective custody housing." Walker Decl. ¶ 9. Defendants note that Brooks fails to name any enemies remaining at WCI or to identify any particular threats. Defs.' Resp. 9. Defendants state that, contrary to Brooks's assertions, there is no court order to transfer inmates from Housing Unit 4. Graham Decl. ¶ 2.

The purpose of a preliminary injunction is to "protect the status quo and to prevent irreparable harm during the pendency of a lawsuit, ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003); *see* Fed. R. Civ. P. 65(a). As a preliminary injunction is "an extraordinary remedy . . . [it] may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, the plaintiff must "establish that [1] he is likely to succeed on the merits, [2] he is likely to suffer irreparable harm in the absence of preliminary relief, [3] the balance of equities tips in his favor, and [4] an injunction is in the public interest." *Id.* at 20; *see Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011). The plaintiff must satisfy each requirement. *The Real Truth About Obama, Inc. v. Federal Election Comm'n*, 575 F.3d 342, 347 (4th Cir. 2009).

As to irreparable harm, the movant must show the harm to be "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Medical Group,* 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted). In the prison context, courts should grant preliminary injunctive relief involving the management of correctional institutions only under exceptional and compelling circumstances. *See Taylor v. Freeman*, 34 F.3d 266, 269 (4th Cir. 1994). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (*per curiam*)).

Brooks has not sustained his burden of demonstrating that his requested injunctive relief is necessary to avoid likely irreparable harm. Brooks's Motions, as well as the records provided in support of Defendants' opposition, demonstrate that Brooks's known enemies are no longer housed at WCI. Brooks has been placed on administrative segregation while his claims of unidentified enemies are investigated, and he reports that he has been able to work things out with his assigned cellmates. Inmates on administrative segregation only have contact with their cellmate and are accompanied by correctional staff each time they leave their cell. Additionally, given that Brooks has a forum for his complaints, the equities do not tip in his favor. Finally, the Court cannot, on the current record, conclude that Brooks is likely to succeed on the merits of his claim. Accordingly, the requests for injunctive relief are denied. *See Winter*, 555 U.S. at 22.

<div align="center">

**DISPOSITIVE MOTION**

</div>

### A.  Standard of Review

Defendants' dispositive motion is styled as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment under Rule 56. A motion styled

in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436–37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998). Because Defendants have filed and relied on declarations and exhibits attached to their dispositive motion, and Brooks was on notice that the court was being asked to grant summary judgment as an alternative to dismissal based upon the pleadings alone, the motion shall be treated as one for summary judgment. *See id.*

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). If the party seeking summary judgment demonstrates that there is an absence of evidence to generate a genuine dispute of material fact with respect to the

nonmovants case, the burden shifts to the nonmoving party to identify evidence that there is a genuine dispute exists as to material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10 (1986).

Because Brooks is proceeding without an attorney, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Nonetheless, the Court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003).

### B. Discussion

#### 1. Failure to Exhaust Administrative Remedies

Defendants raise the affirmative defense that Brooks has failed to exhaust his administrative remedies for his claims regarding access to a bathroom and receipt of food outside of fasting hours. The Prison Litigation Reform Act ("PLRA") provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

A claim that has not been exhausted may not be considered by this Court. *See Jones v. Bock*, 549 U.S. 199, 220 (2007); *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016). Thus, an inmate must complete the prison's internal appeals process, if possible, before bringing suit. *See Chase*, 286 F. Supp. 2d at 529-30. But, an inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e(a); *Ross*, 136 S. Ct. at 1855. The *Ross* Court outlined three circumstances when an administrative remedy is unavailable and an inmate's duty to exhaust available remedies "does not come into play." 136 S. Ct. at 1859. These are when (1) the remedy operates as a "simple dead

end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates";

(2) the administrative scheme is so "opaque" as to become "practically speaking, incapable of

use"; or (3) prison administrators "thwart inmates from taking advantage of a grievance process

through machination, misrepresentation, or intimidation." *Id.* at 1859-60.

Here, the state court remanded previously unaddressed issues of Brook's complaints to the

IGO for further investigation (bathroom access and food to break the fast), and the IGO instructed

the Warden to restart the ARP process to respond to those two issues. Pl.'s May 12, 2017 Ltr.,

ECF No. 17-10, at 73-74 (objecting to the IGO returning the matter to the Warden for further

investigation); *see also* IGO Ltr., ECF No. 17-10, at 71-72 (advising court that matter had been

returned to Warden). Rather than let those issues proceed through the administrative process and

then appeal if dissatisfied with the Warden's response (as he was required to do), Brooks filed this

case. Thus, Brooks has failed to exhaust available remedies as to his claims regarding access to a

bag meal and bathroom access, as well as his claim that he was harassed by officers. While Brooks

may be frustrated with the administrative process, his failure to exhaust it prevented the

development of a full record concerning his claims as to harassment by staff and the denial of bag

meals and access to the bathroom.

## 2. Religious Claims

But even if Brooks had fully exhausted his administrative remedies, each of his claims

regarding interference with his religious practices fail.

> "The Free Exercise Clause of the First Amendment forbids the adoption of
> laws designed to suppress religious beliefs or practices." *Morrison v. Garraghty,*
> 239 F.3d 648, 656 (4th Cir.2001). This encompasses policies that impose a
> substantial burden on a prisoner's right to practice his religion. *Lovelace v. Lee,* 472
> F.3d 174, 198 & n. 8 (4th Cir.2006).

*Wall v. Wade*, 741 F.3d 492, 498 (4th Cir. 2014). Relevant to Brooks's claim, the First Amendment

protects a prisoner's "'clearly established ... right to a diet consistent with his ... religious scruples,'

including proper food during Ramadan." *Id.* (quoting *Lovelace*, 472 F.3d at 198–99). Prisons may impose restrictions on inmates' free exercise rights, however, provided that the restrictions "are 'reasonably adapted to achieving a legitimate penological objective.'" *Id.* at 499 (quoting *Lovelace*, 472 F.3d at 200); *see also Turner v. Safely*, 482 U.S. 78, 89-91 (1987). This "'reasonableness' test . . . accords substantial deference to the professional judgment of correctional officers." *Wall*, 741 F.3d at 499 (citing *Overton v. Bazzetta,* 539 U.S. 126, 132 (2003)).

Brooks's religious practices are provided greater protection than afforded by the First Amendment alone under RLUIPA.[9] *See Wall*, 741 F.3d at 499 n.10. Thus, insofar as Brooks is unable to sustain his RLUIPA claim, there is no need for the Court to separately consider the claim under the First Amendment, as the claim will necessarily fail there too. *See id.*

In relevant part, RLUIPA states:

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . , even if the burden results from a rule of general applicability, unless the government demonstrates that the imposition of the burden on that person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental

---

[9] RLUIPA does not afford a claim for monetary damages against state officials like Defendants. *Sossaman v. Texas*, 563 U.S. 277, 293 (2011) (holding that acceptance of federal funds by States does not amount to consent to waiver of sovereign immunity to RLUIPA claims for monetary damages against state employees in their official capacities); *Rendelman v. Rouse*, 569 F.3d 182, 189 (4th Cir. 2009) (holding that RLUIPA does not authorize a claim for money damages against a state employee sued in his or her individual capacity). As such, Brooks's only potential remedies under RLUIPA are equitable. Given that Brooks no longer is housed at NBCI and his complaints relate to practices  while he was incarcerated there, a request for injunctive relief would be moot. Thus, although  Defendants fail to address the viability of Brooks's RLUIPA claim in light of his transfer from NBCI, it is clear that he cannot maintain a RLUIPA claim, and Defendants are entitled to summary judgment on this basis.. *See Incumaa v. Ozmint*, 507 F.3d 281, 287 (4th Cir. 2007) (holding that transfer or release moots claim for injunctive relief under RLUIPA).

interest.

42 U.S.C. § 2000cc-1(a).  To prevail on a RLUIPA claim, the inmate initially must show that the challenged policy substantially burdens his exercise of his religion. *See* 42 U.S.C. § 2000cc–2(b); *Holt v. Hobbs,*____ U.S. ____, ____, 135 S. Ct. 853, 862 (2015).

A prison regulation imposes a substantial burden when it places "'substantial pressure on an adherent to modify his behavior and to violate his beliefs'" or "forces a person to 'choose between following the precepts of [his] religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of [his] religion . . . on the other hand.'" *Lovelace*, 472 F.3d at 187 (citations omitted).  While Brooks need not prove that the practice at issue is "required or essential to his [or her] religion" he must at least "demonstrate that the government's denial of a particular religious. . . observance was more than an inconvenience to [his] religious practice." *Tillman v. Allen*, 187 F. Supp. 3d 664, 673 (E.D. Va. 2016) (citations omitted).  "'[C]ourts properly consider whether the inmate retains other means for engaging in the particular religious activity . . . in assessing whether a denial of the inmate's preferred method for engaging in that religious exercise imposes a substantial burden.'" *Id.* at 674 (quoting *Shabazz v. Va. Dep't Corr.*, No. 10CV638, 2013 WL 1098102, at *7 (E.D. Va. Mar. 15, 2013)).

RLUIPA "prescribes a shifting burden of proof for inmate religious exercise claims." 42 *Incumaa v. Stirling*, 791 F.3d 517, 525 (4th Cir. 2015).  If the prisoner "demonstrate[s] that the prison's policy exacts a substantial burden on religious exercise," then the burden "shifts to the government to prove its policy furthers a compelling governmental interest by the least restrictive means." *Id.*  Prison security is a compelling interest.  *Cutter v. Wilkinson,* 544 U.S. 709, 725 n.13 (2005). Courts "are ill equipped to deal with the increasingly urgent problems of prison administration and reform" and therefore must exercise restraint in cases dealing with the

administration of prisons. *Procunier v. Martinez*, 416 U.S. 396, 405 (1974). Thus, deference is given to prison administrators. *Cutter*, 544 U.S. at 723.

      a.  Congregate prayer[10]

Congregate Ramadan services are preferred, not mandatory, religious services for members of NOI. Chaplain Lamp Decl. ¶ 6. Moreover, Brooks always retained the ability to pray on his own and during weekly congregate services. Thus, being denied daily congregate services during Ramadan did not require Brooks "to violate his beliefs" or make him choose between following his religious precepts and receiving government benefits. *See Lovelace*, 472 F.3d at 187. Therefore, Brooks has not shown that the denial of daily congregate services during Ramadan created a substantial burden on his religious practice, in violation of RLUIPA. *See id.*; *see also Bryan v. Capers,* No. 06-cv-2515-GRA-BHH, 2007 WL 2116452, at * 6 (D.S.C. July 19, 2007), *aff'd*, 252 Fed. App'x 546 (4th Cir. Oct. 26, 2007) (holding that plaintiff's assertion that congregate prayer as "a major pillar of [his] religion" was insufficient to demonstrate that denial of congregate prayer was a substantial burden on his religious exercise, given he had not been prevented from praying daily or attending weekly congregate services); *Williams v. Jabe*, No. 08-cv-61, 2008 WL 5427766, at *6–7 (W.D. Va. Dec. 31, 2008) (concluding that plaintiff failed to establish that denial of daily congregate prayer was a substantial burden to his religious practice where it was not "a compulsory aspect of his Muslim faith" but merely "preferred" and where plaintiff could pray individually and attend weekly congregational services).

Further, NBCI had a history of gang violence; Defendants obtained credible intelligence that the NOI daily compound-wide services were being used for illicit activity in 2015; and an

---

[10] Because the Court resolves the Motion on other grounds, it need not address Defendants' collateral estoppel argument as to Brooks's claims regarding congregate prayer.

NOI member stabbed Jeter during Ramadan, and Defendants were told that the attack was planned during NOI daily services. Thus, compelling reasons existed for Warden Bishop to cancel the daily congregate services for NOI members for the duration of Ramadan in 2015.

Moreover, Defendants offer evidence that the decision to cancel daily compound wide congregate prayer during Ramadan was the least restrictive alternative to secure the safety of the institution while still permitting religious practices for members of NOI. Brooks argues that Defendants could have continued daily NOI congregate services by separating the North and South compound as they did for weekly services. But Defendants have shown that no additional facilities at NBCI were available for daily congregate services within each individual housing unit, and such an accommodation would have burdened correctional staff who were already stretched thin due to vacancies in staffing. Warden Bishop Decl. ¶ 10 (noting that, during the time period Brooks complains about, July 2015, NBCI had a high number of vacant correctional officer positions, and correctional staff worked a high number of overtime hours).

Brooks also argues that daily NOI services could have been continued for inmates who were "sincere believers," by using the attire they wore to identify them. Compl. 11. Notwithstanding the fact that such a practice would discriminate against those sincere believers who could not purchase the clothing Brooks describes, the practice would do nothing to ensure that only sincere believers attended the services, as anyone could choose to wear "white or blue shirts and bowties" to gain entry to the compound-wide services. Thus, even if Brooks had met his burden, the record shows that Defendants' decision to cancel daily congregate prayer "further[ed] a compelling governmental interest by the least restrictive means." *Incumaa v. Stirling*, 791 F.3d 517, 525 (4th Cir. 2015); *see also* U.S.C. § 2000cc-1(a). Brooks cannot prevail on his claim that his rights were violated by the denial of daily congregate prayer. *See* 42 U.S.C.

§ 2000cc–2(b); *Holt*, 135 S. Ct. at 862.

       b.   Bag meals to break Ramadan fast

Even if Brooks had exhausted his administrative remedies regarding the provision of a bagged meal with which to break his fast, his claim would fail. Significantly, Brooks does not allege in his Compliant, or in any of his administrative remedy or grievance filings, that he was unable to fast. Rather, his allegation seems to be that he was unable to break his fast with food provided by the facility. The record evidence makes clear that Brooks had access to food from the commissary and that he purchased from kitchen workers with which to break his fast. That he may have chosen to use the food from the commissary to pay for a typist rather than to break his fast does not change the determination that he could have eaten it instead had he chosen to. Therefore, the denial of bagged meals did not require Brooks "to violate his beliefs." *See Lovelace*, 472 F.3d at 187.

It is unclear whether free meals in prison would constitute a government benefit. Assuming without deciding that they are, however, choosing to observe a religious fast during meal hours without the availability of a bagged meal to eat before or after the fast could amount to choosing not to receive that benefit, a choice that could be a substantial burden on religious exercise rights. *See Lovelace*, 472 F.3d at 187. Regardless, Warden Bishop states that the denial of the meal bags with which to break the fast was inadvertent, and Brooks offers nothing to demonstrate otherwise. Brooks must establish that Defendants *intentionally* interfered with his religious practices, as negligent interference with religious exercise such as occurred here is not remediable under either the First Amendment or RLUIPA. *See id.* at 194. Thus, Brooks cannot prevail on his claim that Defendants violated his rights by failing to provide him with bagged meals to break his fast. *See id.*; 42 U.S.C. § 2000cc–2(b); *Holt*, 135 S. Ct. at 862.

c.  Bathroom access

Even if Brooks had properly exhausted his claim regarding lack of access to the bathroom to cleanse during religious services, this claim too would fail. Brooks neither alleges, nor demonstrates, in any of his administrative remedy filings or in his Complaint, that the denial of access to the bathroom during services actually impacted his ability to cleanse, which he could do in his cell prior to prayer. Consequently, Brooks did not have "to violate his beliefs" or choose between following his religious precepts and receiving government benefits as a result of the denial of access. *See Lovelace*, 472 F.3d at 187.  Brooks has failed to demonstrate a substantial burden to his religious practice. *See id.*; *see also Blackwell v. Green*, No. RDB-13-272, 2013 WL 5883396, at *8 (D. Md. October 29, 2013) (concluding that access to water in cell sufficient to cleanse prior to services); *Bryan,* 2007 WL 2116452, at *6 (holding that denial of bathroom access during weekly congregate service had "only an incidental effect on the exercise of plaintiff's religion").

Additionally, Defendants have offered a compelling interest for limiting bathroom usage. In light of NBCI's history of gang violence, the tension between the various Muslim groups, the limited space, and limited staffing, the decision to restrict bathroom access during services served a compelling government interest. The restriction was narrowly tailored in order to provide regular congregate prayer to all of the groups in light of the limited space, correctional staff, and tensions between groups. Brooks cannot prevail on his claim that his rights were violated by the denial of bathroom access during services.  *See* 42 U.S.C. § 2000cc–2(b); *Holt*, 135 S. Ct. at 862.

d.  Officers' harassment of Brooks

As to Brooks's complaint that officers spoke to him after the congregate Ramadan services on July 2, 2015 in a hostile way, even if he had properly presented and exhausted this claim through the administrative process, it would be subject to dismissal as Brooks has again failed to allege

how the conduct created a substantial burden to his religious observance. *See* 42 U.S.C. § 2000cc–2(b); *Holt*, 135 S. Ct. at 862; *Lovelace*, 472 F.3d at 187.

### 3. Claim under Maryland Public Information Act ("MPIA"), Md. Code Ann., State Gov't §§ 10-611 – 10-628

Brooks filed a MPIA request for the entire case summary pertaining to ARP NBCI 1345-15. Compl. 10; *see* Partial Denial Ltr., ECF No. 17-10 at 87. He complains that, on June 10, 2016, he received all the requested materials, except for a July 1, 2015 Memorandum from Harbaugh to Warden Bishop, which he was told "would disclose investigative techniques and procedures and would compromise security at the institution." Compl. 10; *see* Partial Denial Letter ("I am denying access to the "Memo from Intel, Lt. Harbaugh" . . . . Disclosure of the file would disclose investigative techniques and procedures and would compromise security at the institution."). It is unclear what Brooks's claim regarding the MPIA process is. In any event, allegations of state law or regulatory violations do not provide a basis for a procedural due process claim. *See Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 392 (4th Cir. 1990). Further, Brooks has not shown any harm, given that he admits that, eventually, "Plaintiff recieved [sic] the Memorandum." Pl.'s Rule 56(d) Mot. & Decl. 32. Indeed, the memorandum is a part of the record in this case. *See* July 1, 2015 Harbaugh Mem. to Warden Bishop, ECF No. 17-10, at 88.

### 4. Due Process

To the extent Brooks claims that Defendants failed to properly process his ARPs and grievances, such a claim also fails. "[I]nmates have no constitutional entitlement or due process interest in access to a grievance procedure." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 541 (4th Cir. 2017) (discussing *Adams v. Rice*, 40 F.3d 72 (4th Cir. 1994); *see Robinson v. Wexford*, No. ELH-17-1467, 2017 WL 4838785, at *3 (D. Md. Oct. 26, 2017) ("[E]ven assuming, arguendo, that defendants . . . did not satisfactorily investigate or respond to plaintiff's administrative grievances,

no underlying constitutional claim has been stated" because "'inmates have no constitutional entitlement or due process interest in access to a grievance procedure'" (quoting *Booker*)).

## CONCLUSION

For the foregoing reasons, Plaintiff's Rule 56(d) Motion, ECF No. 31, is DENIED; insofar as ECF No. 35 could be construed as a Rule 15(d) motion to supplement, *see* Fed. R. Civ. P. 1, it is DENIED; Defendants' Motion to Strike, ECF No. 36 is DENIED as moot; Defendants' dispositive motion, ECF No. 17, construed as a Motion for Summary Judgment, is GRANTED; and Plaintiff's Motions for Injunctive Relief, ECF Nos. 41, 43, are DENIED.[11]  A separate Order follows.


March 21, 2019                              _____/S/_____
Date                                       Paul W. Grimm
                                           United States District Judge

---

[11] Having found no violation of the Constitution or RLUIPA the Court need not address Defendants' immunity arguments.